# Exhibit "1"

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "**Agreement**"), is made as of the Effective Date set forth below between PRODUCE PAY, INC., a Delaware corporation ("**Company**"), and the Distributor identified below (the "**Distributor**"). This Agreement consists of: Part I (Transaction Terms) which identifies the specific economic terms between the parties; and Part II which contains the general terms and conditions. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article 2 of Part II of this Agreement.

Company has developed and made available an online software Platform to provide alternative financing for distributors and producers of Produce as described in Part II. The Distributor and Company wish to enter into an agreement that memorializes the Distributor's use of the Platform and Company's provision of the Platform and any associated services, including, without limitation, provision of Marketplacing services in consideration for the payment of the Marketplacing Commission. The parties hereby agree as follows:

## Part I – Transaction Terms

| Distributor Name | Marcobella Produce LLC |
|---|---|
| Distributor Address | 2501 Military Hwy Suites A-5, A-5 |
| Distributor City, State, Zip, Country | McAllen, Texas 78503 |
| Effective Date | March 15, ~~2017~~ 2018 |
| Marketplacing Commission Rate | 1% |
| Existing Producer Relationships | [Distributor list existing Producer relationships]<br>1)<br>2)<br>3)<br>4)<br>5) |

## Part II – General Terms and Conditions

1. **THE PLATFORM**

   Company has developed and made available an online software platform to provide alternative financing for produce growers and distributors that operates in the following manner (which manner of operation may be changed by Company from time to time in its sole discretion):

   (a) The Distributor shall log into the Platform to notify Company that a Producer has shipped a Distributed Asset Pool to the Distributor.

   (b) The Producer will be an approved and registered Producer on the Platform under which the Distributor can accept or reject a Distributed Asset Pool.

   (c) In connection with Distributor's use of the Platform, the Company may introduce Distributor to new Producers that Distributor does not have existing relationships

with. In that case, the Company will earn a Marketplacing Commission on each sale and distribution by Distributor, on a consignment basis, of a Distributed Asset Pool from any such Producer.

(d) The Distributor shall notify Company of its acceptance or rejection of shipment of such Distributed Asset Pool as satisfactory for sale by the Distributor to retailers or wholesalers under the terms of this Agreement. The Distributor will accept the shipment in the Platform and attach shipping documents to the shipment to verify case quantities. All rejected Produce shall not be included in a Distributed Asset Pool and shall be removed from the Platform.

(e) At its sole discretion, Company can then, upon such notification by the Distributor of acceptance of a Distributed Asset Pool through said Platform, remit a first payment to the Producer and take title to the Distributed Asset Pool.

(f) Upon Company taking title to the Distributed Asset Pool through the Platform, the Distributor will thereby be required to remit to the Company the Net Sale Proceeds for such Distributed Asset Pool.

(g) With respect to each Distributed Asset Pool, upon shipment and invoicing of such Distributed Asset Pool, Distributor shall calculate and notify Company via the Platform of the Gross Sale Proceeds from the retailer or wholesaler for such Distributed Asset Pool, the Distributors Commission and the Distributor Deductions thereon, and shall attach the invoice for such sale.

(h) Upon request from Producer, the Company in its sole discretion may make an additional purchase price payment to the Producer through the Platform after the Distributor has sold the Produce and entered the information required above into the Platform.

(i) With respect to each Distributed Asset Pool, upon receipt of notification from the Distributor of the shipment and invoicing of such Distributed Asset Pool Company through the Platform, Company shall calculate and notify the Distributor of the Company Proceeds and the Net Sale Proceeds, as well as any Deficit and Excess Deficit.

(j) Distributor will then pay Company the Net Sale Proceeds and the Marketplacing Commission, if any, for such Distributed Asset Pool and the Excess Deficit, if any, for any other Distributed Asset Pool.

(k) The Distributor acknowledges and agrees that Company is a bona fide purchaser acting in good faith with respect to all of its interactions with the Distributor, including, without limitation, all transactions contemplated by this Agreement; the Distributor further acknowledges and agrees that all amounts due and owing to Company in connection with this Agreement, including, without limitation, the Marketplacing Commission, Company Expenses, and any other commissions, fees and amounts received by Company in connection with a Distributed Asset Pool are duly earned obtained for fair and reasonable value from the Distributor.

(l) Under Prepayment Agreements (defined below), Company will from time to time advance to Producers who are parties to such Prepayment Agreements amounts

-2-

referred to as the Prepaid Asset Pool Purchase Price (as defined in such Prepayment Agreements). The Distributor is guaranteeing hereunder the repayment of all payments due to Company under the Prepayment Agreements and is agreeing to pay to Company hereunder a portion of the Gross Proceeds from any related sales of Produce equal to the Prepayment Recovery Deduction as set forth in the respective Prepayment Agreement (the "**Prepayment Recovery Deduction**") until Company has recovered therefrom the Prepayment Asset Pool Purchase Price (as defined in the applicable Prepayment Agreement), the Prepayment Sales Commission (as defined in the applicable Prepayment Agreement) and all other associated fees and other payments due under the Prepayment Agreements (the "**Prepayment Agreement Obligations**"), as well as paying any Excess Deficit related thereto (as defined below).

## 2. DEFINITIONS; CONSTRUCTION

2.1 <u>Definitions</u>. Capitalized terms used in this Agreement shall be defined as follows:

"**Affiliate**" of a Party means any corporation, limited liability company, partnership or other legal entity that controls, is controlled by, or is under common control with such Party. For the purposes of this definition, an entity shall be deemed to control another entity if it owns or controls directly or indirectly at least fifty-one percent (51%) of the voting equity or assets of the other entity (or other comparable ownership interest for an entity other than a corporation).

"**Asset Pool**" means Produce sold in one or more allotments from a Producer to the Company.

"**Company Expenses**" means, with respect to each Distributed Asset Pool, all liabilities and expenses of every kind and character incurred by Company in the enforcement of its rights under this Agreement or the collection of any payments owed by Distributor, including, without limitation, all liabilities, interest, costs and fees, arising under or from any credit agreement, forward purchase agreement, note, bill of sale, open account, overdraft, credit card, lease, endorsement, surety agreement, guaranty, acceptance, foreign exchange contract or depository service contract, whether payable to Company or to a third party and subsequently acquired by Company, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing.

"**Company Proceeds**" means, with respect to a particular Distributed Asset Pool, the sum of the Prepayment Recovery Deductions, Asset Pool Purchase Price, the Sales Commission, the Marketplacing Fee, the Company Expenses, and, if not previously paid, the Application Fee

"**Deficit**" has the meaning set forth in Section 6.2.

**"Distributed Asset Pool"** means with respect to any Asset Pool, the portion or amount of such Asset Pool actually sold and distributed, on a consignment basis, by the Distributor.

**"Distributor's Commission"** means the commission payable to a Distributor under a Producer Agreement with respect to the sale and distribution of a Distributed Asset Pool.

**"Distributor Deductions"** means any and all (a) deductions from proceeds of the sale and distribution of a Distributed Asset Pool the Distributor deems appropriate in its business judgment and in accordance with the applicable Producer Agreement or other governing agreement and (b) taxes, fees, commissions and other amounts assessed by parties other than the Distributor or Company on account of the sale and distribution of a Distributed Asset Pool to the extent that such amounts have been actually paid by (or will contemporaneously be paid by) a Distributor out of proceeds from such sale. Producer acknowledges that Company is not responsible for the determination or verification of Distributor Deductions.

**"Excess Deficit"** has the meaning set forth in Section 6.2.

**"Gross Sale Proceeds"** means the proceeds invoiced by the Distributor on behalf of Company for the sale of a Distributed Asset Pool, without deduction of any kind.

**"Marketplacing Commission"** means a commission payable to Company from the Gross Sale Proceeds of each Distributed Asset Pool from a Marketplacing Producer sold and distributed, on a consignment basis, by Distributor in an amount equal to the Gross Sales Proceeds multiplied by the Marketplacing Commission Rate set forth in the Transaction Terms.

**"Marketplacing Producer"** means a Producer introduced by Company to Distributor. The Producers identified as Existing Producer Relationships in the Transaction Terms will not be treated as Marketplacing Producers.

**"Net Sale Proceeds"** means the Gross Sale Proceeds for a particular Distributed Asset Pool less (a) the Distributor's Commission for that Distributed Asset Pool, and (b) the Distributor Deductions for that Distributed Asset Pool, as (a) and (b) are limited by the application of Section 6.2 hereof.

**"Party"** refers to Company or the Distributor, and **"Parties"** shall collectively refer to both Company and the Distributor.

**"Platform"** means, the software platform and software as a service solution provided by Company to the Distributor and other parties with respect to any Asset Pool, that enables (a) such Asset Pool to be purchased by Company via the Platform, and (b) all funds owed by Distributor to Company to be remitted electronically via the Platform.

**"Prepayment Agreement"** means a Prepayment Agreement entered into by the Company with any of the following Producers: (a) Heyvel and (b) any other Producer referred or introduced to the Company by Distributor.

"**Produce**" means all products, items and goods, including, but not limited to, fruits, vegetables, grains, root, crops of the forest, in their natural or unprocessed states and in all of their respective varieties, produced by a farmer and purchased by Company.

"**Produce Purchase Agreement**" means an agreement between the Company and a Producer relating to the purchase of a Distributed Asset Pool by the Company.

"**Producer**" refers to any party from which Distributor acquires Produce that is sold to Company under this Agreement.

"**Producer Agreement**" means an agreement between the Distributor and a Producer relating to the sale of a Distributed Asset Pool by Distributor, on a consignment basis.

"**Term**" means the period commencing on the Effective Date and ending on the date that is one year from the Effective Date, and the term shall be automatically extended for consecutive one (1) year periods on each anniversary of the Effective Date, unless either party shall have provided written notice of termination to the other party not less than thirty (30) days prior to the expiration of the current term Effective Date.

"**Transaction Terms**" has the meaning given in the first paragraph of Part I of this Agreement.

3. **APPOINTMENT; GENERAL CONSIGNMENT TERMS**

3.1 Nonexclusive Appointment. Subject to the terms and conditions of this Agreement, Company hereby appoints the Distributor as its nonexclusive distributor to sell the Produce in a final form for fresh market shipment and purchase by the applicable grocer, other retailer or permitted third party. It is specifically understood and agreed that this appointment is nonexclusive in nature and that nothing herein contained shall be construed to grant the Distributor any exclusive rights.

3.2 Title to Produce. Title to the Produce will remain with Company until such Produce has been sold, on a consignment basis, on its behalf by the Distributor and the Produce has been accepted by the applicable grocer, other retailer or other purchaser. The Distributor represents and warrants that (a) the shipment and consignment of the Produce by Company to the Distributor under this Agreement does not violate any agreement or covenant of the Distributor with any lender or other third party, and (b) the Produce shall be free from any and all liens, encumbrances, charges and security interests arising by, through or under the Distributor. In furtherance of the foregoing, the Distributor shall notify all of its lenders and other creditors, both secured and unsecured, of the fact that the Produce is the property of Company, regardless of whether such Produce is in the possession of the Distributor or any accounts payables issued in connection with such Produce are in the name of the Distributor. Accordingly, the Distributor agrees to coordinate with its lenders and other creditors to carve-out or otherwise remove the Produce, all proceeds and related assets thereof from any security interests and liens granted by the Distributor to any such lender or other creditor of the Distributor and to provide Company with evidence of any such carve-out.

3.3 Disqualified Producers. From time to time, Company may provide the Distributor with one or more names of Producers for which it will cease conducting business or otherwise does not intend to enter into a business relationship (a "**Disqualified Producer**"). In connection with any transactions with Company, the Distributor agrees

not to engage in business dealings with a Disqualified Producer or disclose the status of such distributor as a Disqualified Producer.

3.4 Relocation or Name Change. The Distributor shall provide Company with written notice at least thirty (30) calendar days prior to the Distributor's change of name or location.

4. **OBLIGATIONS**

4.1 Inventory. The Parties acknowledge that the Producer will ship the Produce directly to the Distributor and that Company will not be responsible for maintaining any inventory.

    (a) The Distributor shall store any Produce inventory in accordance with the highest industry practice in order to preserve and protect the Produce. Towards this end, the Distributor shall store inventory in designated storage areas in a manner appropriate for maintaining such Produce in good and saleable condition as required by Produce labeling specifications and storage conditions specified by Company and market conventions.

    (b) Within ten (10) days' prior notice, Company or its representative shall have the right to visit or assess all locations where the Distributor maintains or ships inventory of Produce to conduct a quality assurance audit of such facilities and/or an on-site surveillance of its inventory storage tracking. In the event that an audit reveals matters that Company determines should be corrected by the Distributor, Company shall provide, in writing a list of such matters and any proposed corrective action to be taken by the Distributor. The Distributor shall respond within fifteen (15) days thereafter of the corrective action to be taken by the Distributor and an estimated completion date.

4.2 Invoices. The Distributor acknowledges and agrees that any misrepresentations or other fraudulent activity of the Distributor with respect to any invoice or other proof of sale submitted by the Distributor to Company shall be prosecuted to the fullest extent of all applicable statues, regulations and other laws.

4.3 Promotion of Produce. The Distributor shall be responsible for all promotional and marketing activities that the Distributor undertakes related to the sales and distribution of the Produce.

4.4 Accuracy of Data in Platform. Distributor is responsible for validating accurate information into the Platform. Information that is the responsibility of the Distributor includes but is not limited to: commodity type, unit of measure, items per unit, units. Any errors or costs resulting from inaccurate information that is validated as accurate by the Distributor will be at the cost to the Distributor

4.5 Complaints. The Distributor shall promptly forward to Company any customer complaints or comments concerning the Produce. For any customer complaint, the Distributor shall send Company the nature of the complaint. The foregoing information shall be communicated in written form (e-mail, fax or express mail).

4.6 Limitation of Liability. COMPANY SHALL NOT BE LIABLE FOR ANY DAMAGES CAUSED BY THE CONSUMPTION OF THE PRODUCE. FURTHER, COMPANY'S LIABILITY ARISING OUT OF THIS AGREEMENT, THE TERMINATION THEREOF, AND/OR SALE OF THE PRODUCE SHALL BE

LIMITED TO THE MARKETPLACING COMMISSION ACTUALLY RECEIVED IN THE 12 MONTHS PRIOR TO THE EVENT THAT GAVE RISE TO SUCH LIABILITY. COMPANY SHALL NOT BE LIABLE TO THE DISTRIBUTOR OR ANY OTHER PARTY FOR ANY DAMAGES CAUSED BY FAILURE TO MAKE SHIPMENT ON ANY ORDER OR CONTRACT OR FOR DELAY IN DELIVERY OF ANY PRODUCE. IN NO EVENT SHALL COMPANY BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS, LOST PROFITS OR ANY OTHER SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING OUT OF THIS AGREEMENT. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED HEREIN OR IN THE WARRANTY FOUND IN THE PRODUCE.

4.7 <u>Basic Business Terms and License</u>. Company shall operate the Platform as set forth in Section 1 and the Distributor shall use the Platform as set forth in Section 1, in each case as such Platform and the operation thereof may be modified by the Company from time to time. Company grants the Distributor the non-exclusive right and license to use the Platform as provided for under the terms of this Agreement.

5. **COVENANTS**

5.1 <u>Trademarks</u>. The Distributor shall not: (i) register or attempt to register any trademarks, copyrights and trade names of Company (collectively, the **"Trademarks"**) in any jurisdiction; (ii) adopt or register any trademark, trade name or domain name which is confusingly similar to any of the Trademarks; (iii) incorporate any Trademarks into the Distributor's corporate name; or (iv) represent in any manner that it has any ownership in the Trademarks or registrations thereof.

5.2 <u>Intellectual Property</u>.

   (a) The Distributor agrees that Company owns all right, title, and interest in the Platform and Company's rights to letters patents, Trademarks, other trademarks, registrations and approvals, inventions, copyrights, know-how, trade secrets and other intangible property concerning Produce (collectively, **"Intellectual Property"**) and the Distributor shall acquire no rights in any Intellectual Property. The use by the Distributor of any of Intellectual Property is authorized only for the purposes herein set forth, and upon termination of this Agreement for any reason such authorization shall cease.

   (b) The Distributor hereby irrevocably assigns to Company any right of title or interest that the Distributor may have or acquire in any modifications, designs or improvements of Company's Intellectual Property by its employees or agents.

   (c) The Distributor shall not dispute or contest or assist others to dispute or contest the validity of any of Company's Intellectual Property. In addition, if the Distributor so disputes or contests or assists others to dispute or contest the validity of any of Company's Intellectual Property, Company shall have the right to terminate this Agreement immediately upon written notice to the Distributor.

(d) The Distributor shall promptly and fully notify Company of any actual, threatened or suspected infringement of any Intellectual Property of Company which comes to the Distributor's attention.

5.3 <u>Compliance with U.S. Sanctions Regulations</u>. The Distributor understands and acknowledges that Company is subject to regulation by agencies of the U.S. Government, including but not limited to, the U.S. Department of Treasury which prohibit the sale, export or diversion of produce to certain countries, including, as of the Effective Date, Iran, Syria, Myanmar (Burma), North Korea, Sudan and Cuba. The Distributor hereby warrants that it shall not sell, directly or indirectly, any Produce to customers which it knows or reasonably should know will resell or export the Produce to parties in the above named countries.

5.4 <u>Indemnification</u>.

(a) The Distributor agrees to defend, indemnify and hold Company harmless for any and all claims, counterclaims, costs, liabilities and responsibilities, regardless of the claimant or its place of filing a claim, resulting from or in any way associated with: (i) the functioning or performance of the Distributor as the distributor, supplier and seller of the Produce supplied to the Distributor by Company, (ii) any taxes assessed with respect to the sale and distribution of any Distributed Asset Pool, to the extent not otherwise paid by the Distributor, (iii) any action or omission by the Distributor which results in the imposition of any lien, consignment to a third party, encumbrance, security interest or charge with respect to the Distributed Asset Pool that has been sold to Company, (iv) any breach by Distributor of any representation, warranty or covenant in this Agreement, and (v) any damage or injury caused by the Produce, including any product liability claims or recall costs. The Distributor shall be the warrantor or guarantor of the safety, operation and performance of the Produce covered by this Agreement to whatever extent such a warranty or guarantee is made by the Distributor that exceeds the warranty or guarantee on the Produce given by Company.

(b) Company agrees to defend, indemnify and hold the Distributor harmless for any and all claims, counterclaims, costs, liabilities and responsibilities, regardless of the claimant or its place of filing a claim, resulting from or in any way associated with: (i) the functioning or performance of Company as the operator of the Platform and (ii) any taxes assessed with respect to the operation of the Platform to the extent not otherwise paid by Company.

6. **TERMS AND CONDITIONS OF SALES**

6.1 <u>Payment to Company</u>. Upon the sale of a Distributed Asset Pool, the Company is entitled to receive, and Distributor will promptly remit to Company, an amount equal to the Net Sale Proceeds plus the Marketplacing Commission.

6.2 <u>Deficit</u>. If for a particular Distributed Asset Pool (A) the amount that the Company is entitled to receive as Company Proceeds under the Produce Purchase Agreement (including the amount that the Company is entitled to receive as a Prepayment Recovery Deduction under the applicable Prepayment Agreement, if any, or other amounts owed under the applicable Prepayment Agreement) exceeds (B) the amount of the Gross Sale Proceeds less the Distributor's Commission and Distributor Deductions (the amount of

-8-

such excess, the "**Deficit**"), then the amount of Distributor's Commission and Distributor Deductions that the Distributor may withhold from the Gross Sale Proceeds before transferring the proceeds from such Distributed Asset Pool to the Company shall be limited as follows:

(a) If the Deficit is less than the sum of the Distributor's Commission and Distributor Deductions for such Distributed Asset Pool, then the amount of Distributor's Commissions and Distributor Deductions that the Distributor may withhold from the Gross Sale Proceeds shall be reduced by the amount of the Deficit.

(b) If the Deficit is greater than or equal to the sum of the Distributor's Commission and Distributor Deductions for such Distributed Asset Pool, then (i) the Distributor may not withhold any Distributor's Commissions or Distributor Deductions from the Gross Sale Proceeds and shall pay the entire Gross Sale Proceeds to the Company (in which case, the Net Sale Proceeds shall equal the Gross Sale Proceeds for all purposes hereof), (ii) to the extent that the Company Proceeds exceed the Gross Sale Proceeds (the "**Excess Deficit**"), then the Company shall be entitled to receive from the Distributor, on a first-priority basis, the entire Gross Sale Proceeds for any other Distributed Asset Pools purchased by Company from the Producer, until such time as the Excess Deficit, together with any and all outstanding fees and charges owed to the Company by the Producer and/or the Distributor, are satisfied in full, and (iii) the Company may at any time demand payment from the Distributor of an amount equal to the Excess Deficit plus, to the extent not otherwise included in the Excess Deficit, any other outstanding Prepayment Agreement Obligations. The foregoing collection demand may be made by the Company first to the Distributor without attempting to collect any amount from the Producer.

6.3 Marketplacing. In consideration for the Company introducing Distributor to new Producers, Distributor acknowledges that for each Marketplacing Producer introduced to it by the Company, it will conduct all sales of Produce to such Marketplacing Producer on the Platform for a period of at least two years after the date of introduction. Distributor agrees that it will keep accurate books of account and record of all Produce sales during the term of this Agreement and for two years thereafter and will allow Company access to these books at all reasonable times for audit for the purpose of verifying Distributor's compliance with the terms hereof. Should an audit by the Company show non-compliance with the terms hereof, Distributor shall immediately pay Company the full amount that Company would have received in Marketplacing Commissions if Distributor would have fully complied herewith, plus interest at the rate of 1.5% per month, or the maximum rate permitted by law if lower, plus the costs of such audit. The audit rights hereunder shall survive for a period of three years following the termination of this Agreement.

6.4 Taxes. The Gross Sale Proceeds does not include any foreign, federal, state or local taxes that may be applicable to the Produce, including sales, excise, value-added, withholding, and other taxes, which shall be the responsibility of the Distributor. Each party shall be solely responsible for any taxes imposed on it based upon its net income.

6.5 Receivables Risk. The Distributor shall bear all default risk of any purchaser of the Produce. As such, Distributor shall compensate Company based on the first invoiced

Gross Sale Proceeds even if a grocer, retailer or other purchaser or end user defaults on payment after having taken possession of the Produce.

6.6 Authorization for Electronic Credit or Debit. Distributor irrevocably authorizes Company to initiate electronic credit or debit entries to Distributor's account on file with Company at any time and without regard to the source of any monies in such account for any amount owed to Company under this Agreement if such amount is not paid within fifteen (15) calendar days of the date such payment was due. As a condition to Company entering into this Agreement, Distributor shall provide the bank at which its account is held with any and all approvals, consents or other permissions which may be necessary in order for such bank to pay direct debits to Company. This authority will remain in full force and effect until (1) Company notifies the bank that all monies due to Company under this Agreement have been paid in full; or (2) the parties have otherwise agreed in writing to terminate this authorization. Company may levy an administrative charge if a direct debit for any charge is returned unpaid.

## 7. REGULATORY MATTERS

7.1 Notice of Certain Events. Each Party shall promptly notify the other after it becomes aware of any of the following events: (a) alleged infringement of the Trademarks or Intellectual Property applicable to Produce by any third party; (b) alleged infringement of the trademark, patent or proprietary rights of others in connection with actions taken hereunder; (c) liability claims relating to the Produce; (d) any correspondence exchanged with federal or local authorities regarding the distribution of the Produce; and (e) any other event that may reasonably be expected to have a material adverse effect upon the sale or distribution of the Produce.

7.2 Traceability. Each Party shall maintain such traceability records with respect to the Produce as shall be necessary to comply with applicable statues, regulations and other law.

7.3 Recall or Advisory Actions.

(a) In the event of a recall of any Produce as a result of any governmental action, the Distributor shall notify Company in writing in a timely manner upon making such recall.

(b) The Distributor shall have and maintain at all times defined procedures to facilitate corrective action, including the actions described in this Section 7.3, and the Distributor shall bear the cost of all such corrective action and any and all liability associated with a Produce recall.

## 8. PROPRIETARY INFORMATION; NON-COMPETITION, NON-SOLICITATION AND NON-DISPARAGEMENT

8.1 Confidentiality. The Distributor shall strictly maintain and shall cause its officers, directors, employees, and agents to so maintain, the confidentiality of the terms of this Agreement and any trade secrets, know-how, Producer lists, financial information or other proprietary information of Company or its affiliates which is not a matter of public knowledge, which, for the avoidance of doubt, shall include information regarding the operation of the Platform and any documentation thereof (collectively, the **"Proprietary Information"**) during the Term of this Agreement and for two (2) years thereafter (such period, the **"Restricted Period"**). For purposes hereof, Proprietary

Information shall not include information disclosed by Company or its Affiliates to the Distributor which the Distributor can establish (a) was known by the Distributor or any of its divisions, subsidiaries or affiliates prior to the date thereof; (b) was received by the Distributor from a third party having the lawful right to disclose such information; or (c) is in the public domain through no fault of the Distributor or its officers, directors, employees, affiliates or agents. The Distributor shall not make or retain any copies of any Proprietary Information that may have been entrusted to it and shall use Proprietary Information solely for purposes of exercising its rights and carrying out its obligations under this Agreement. Upon termination of this Agreement for any reason, the Distributor shall immediately cease using any Proprietary Information.

8.2 <u>Non-competition, Non-solicitation and Non-disparagement</u>. The Distributor shall not:

(a) during the Restricted Period, directly or indirectly, own, operate, manage, control, participate in, be employed by, consult with, advise or engage in services for any person or entity engaged in Company's business of providing an online software platform to facilitate alternative financing options for producers and distributors of Produce;

(b) during the Restricted Period, directly or indirectly induce or attempt to induce any customer, client, vendor, supplier or other business relation of or to the Company or any of its Affiliates, to cease doing business with the Company or any of its Affiliates, to reduce or otherwise adversely change its business with the Company or any of its Affiliates, or in any other way deliberately interfere with the relationship between the Company or any of its Affiliates, on the one hand, and any such customer, client, vendor, supplier or other business relation, on the other hand; or

(c) after the Effective Date, directly or indirectly, make any written or oral statement concerning the Company that is harmful to the Company, its business or the business reputation of the Company.

8.3 <u>Injunctive Relief</u>. Given the nature of the Proprietary Information and the other matters covered in this Article 8, the Parties agree that monetary damages may not be a sufficient remedy for any breach of this Article 8. In addition to all other remedies, Company shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach or threatened breach of this Article 8.

9. **TERM AND TERMINATION**

9.1 <u>Term</u>. Unless terminated pursuant to this Section 9.1, this Agreement shall remain in effect during the Term. Company retains the right to terminate this Agreement and its obligations hereunder to the Distributor at any time upon written notice to the Distributor, subject to payment of all amounts owed as per the terms of this Agreement to the Distributor. The Distributor may terminate its use of the Platform and this Agreement on a going forward basis, but shall not be able to terminate any transactions for Distributed Asset Pools wherein Company has already paid the Producer for that Produce and, provided, further, that immediately upon such date of termination, the Distributor shall no longer be entitled to access the Platform (and the non-exclusive license granted to the Distributor to use the Platform in Section 4.7 shall be immediately revoked) with respect to Distributed Asset Pools that have not already been sold to Company.

WEST\275455874.2

9.2 Effect of Expiration or Termination.

    (a) Payments. Expiration or termination shall not relieve either Party of its requirement to pay any sums accrued and owed to the other Party under the terms of this Agreement as of the date of expiration or termination.

    (c) Records. Within thirty (30) days of termination or expiration of this Agreement, the Distributor shall deliver to Company copies of all sales records for the previous one (1) year. From the time that notice of termination is received by either Party until the effective termination date, the Distributor shall notify Company in writing of all Produce inquiries.

    (j) No Extension. Company's acceptance of any purchase order from the Distributor, or sale or license of any Produce to the Distributor after the effective date of expiry or termination of this Agreement shall not be construed as a renewal or extension hereof, or as a waiver of expiry or termination of this Agreement.

    (k) Survival. Sections 4,5, 4.6, 6.3 and 7.3 and Articles 5 and 8-12 will survive termination of this Agreement, together will all payment obligations to the Company for services provided hereunder or that otherwise accrued during the Term.

## 10. MISCELLANEOUS

10.1 Notices. All notices or other communication required or permitted to be given pursuant to this Agreement shall be addressed to Distributor at the address provided in the Transaction Terms or to the Company at its principal offices. All notices under this Agreement shall be deemed to have been duly given or made if sent by one of the following means: (i) electronically through the Platform or through an email address provided in this Agreement; (ii) registered or certified U.S. or national mail service mail, return receipt requested; (iii) hand delivered; or (iv) sent by prepaid overnight courier such as Federal Express. Each notice or other communication shall be deemed to have been given or made on the date of actual receipt by the recipient. Either party may give to the other written notice of change of address, in which event any communication shall thereafter be given to such party as above provided at such changed address.

10.2 Assignment. This Agreement shall not be assigned or delegated by the Distributor in whole or in part without the prior written consent of Company, which may be withheld by Company in its sole discretion.

10.3 Waiver: Severability. Failure by either party to enforce a provision of this Agreement shall not constitute a waiver of that or any other provision of the Agreement. If one or more provisions of this Agreement are held to be unenforceable under applicable statute, regulation or other law, Company and the Distributor shall renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each Party as close as possible to that under the provision rendered unenforceable. If Company and the Distributor cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision

were so excluded, and (c) the balance of the Agreement shall be enforceable in accordance with its terms.

10.4 Independent Contractors. Nothing contained in this Agreement shall be construed (a) to give either Party the power to direct or control the day to-day activities of the other or (b) to constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking. The Distributor shall not enter into any contract or commitment on behalf of Company without the prior written approval of Company.

10.5 Force Majeure.

(a) Neither Party shall be liable to the other Party for its failure to perform any of its obligations hereunder, other than payment obligations, during any period in which such performance is delayed by circumstances beyond such Party's reasonable control, whether foreseeable or unforeseeable, including fire, flood, earthquake, war, strike, lockout, civil or military authority, acts of the public enemy, insurrection, embargo, container or transportation shortage, delay of suppliers due to such causes, or the intervention of any governmental authority (a "**Force Majeure Event**").

(b) The Party so affected shall: (i) give prompt written notice to the other Party of the nature and date of commencement of the Force Majeure Event and its expected duration; and (ii) use its commercially reasonable efforts to relieve the effect of such Force Majeure Event as rapidly as possible.

(c) If the force majeure in question continues for a continuous period in excess of ninety (90) days, the Party injured by the inability of the other Party to perform shall have the right upon written notice to the other to (i) terminate this Agreement with respect to Produce not already shipped, or (ii) treat this Agreement as suspended during the delay and reduce any commitment in proportion of the delay.

10.6 Governing Law and Arbitration.

(a) Governing Law. This Agreement and all documents, agreements, contracts and instruments executed in connection herewith shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflict of laws provisions that would require the application of the laws of another jurisdiction. Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

(b) Consent to Jurisdiction. The Parties hereby irrevocably submit to the non-exclusive jurisdiction of any United States federal court or Delaware state court located in Delaware in any action or proceeding arising out of or relating to this Agreement or any documents executed in connection herewith and the Parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in any such United States Federal Court or

Delaware state court. Each Party irrevocably consents to the service of any and all process in any such action or proceeding brought in any court in or of the State of Delaware by the delivery of copies of such process to it at the applicable addresses specified on the signature page hereto or by certified mail directed to such address or such other address as may be designated by it in a notice to the other parties that complies as to delivery with the terms of Section 10.1.

10.7 Entire Agreement. This Agreement, together with its exhibits, the Prepayment Agreements, the Produce Purchase Agreements and any other agreements referenced herein, sets forth the sole understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersedes all other prior and contemporaneous discussions, negotiations agreements and understandings, whether written or oral, between them, including the Prior Agreement. It is specifically agreed that no printed standard terms that may appear on any quotations, purchase orders, acceptance notes or invoices relating to the Produce in this Agreement shall have any effect.

10.8 Amendments. No modification of this Agreement or of any covenant, condition or limitation contained herein shall be valid or effective unless it is (a) in writing and duly executed by the parties hereto, or (b) electronically accepted by Distributor on the Platform. Distributor's continued use of the Platform after notification of modifications of this Agreement by Company via the Platform will be deemed electronic acceptance by Distributor hereunder.

10.9 Headings. The headings used in this Agreement have been added for the convenience of the Parties and shall not affect the meaning, construction or interpretation of any provision hereof.

10.10 Counterparts. This Agreement may be executed by PDF or facsimile, email, electronic signature (such as DocuSign or EchoSign), or through electronic acceptance through the Platform, and in one or more counterparts, each of which shall constitute a duplicate original of this Agreement but together shall constitute one and the same instrument.

10.11 Attorneys' Fees. in any action arising out of or relating to this Agreement, the non-prevailing party will pay the substantially prevailing party's reasonable attorneys' fees, costs, and necessary disbursements, whether or not the action is prosecuted to award or judgment.

10.12 Insurance. Without limiting any obligations under this Agreement, Distributor will, at its sole cost and expense, procure and maintain in effect at all times during the term of this Agreement, and for the statutory period for which Distributor may be liable for defects or other liabilities arising out of the Agreement, including liability relating to the Produce, Commercial General Liability Coverage as a food broker of at least $1,000,000 per occurrence and $2,000,000 in the aggregate. Distributor will name Company as an additional insured and will provide certificates evidencing such insurance within 30 days of the Effective Date and each anniversary of the Effective Date through the term of this Agreement.

11. REPRESENTATIONS AND WARRANTIES

11.1 By Distributor. The Distributor hereby represents and warrants to Company as follows:

(a) it is duly organized, validly existing and in good standing under the laws of its state of its incorporation and has the power and authority to enter into this Agreement and to fully perform its obligations hereunder;

(b) this Agreement has been executed by its duly authorized representative and constitutes its valid, binding obligation;

(c) that the Producer it is sourcing Produce from owns sufficient rights in the Produce to be able to transfer title to each Distributed Asset Pool to be conveyed or as has been conveyed to Company;

(d) the Produce is of merchantable quality, fit for its particular purpose;

(e) each Distributed Asset Pool to be conveyed or as has been conveyed to Company is the exclusive property of the Producer and is not subject to any lien, consignment arrangement, encumbrance, security interest, charge, filing with a personal property registry or any financing statement whatsoever;

(f) the Produce that comprises any Distributed Asset Pool to be conveyed or as has been conveyed to Company complies with all applicable laws, statutes, regulations and judgments, including, if applicable, all requirements of the United States Food and Drug Administration and the United States Department of Agriculture; and

(g) it has all licenses, permits, consents or approvals (including, without limitation, all import licenses, registrations and permits) from or by, and has made all filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for it to sell the Produce on a consignment basis hereunder.

11.2 By Company. Company hereby represents and warrants to the Distributor as follows:

(h) it is duly organized, validly existing and in good standing under the laws of its state of its incorporation and has the power and authority to enter into this Agreement and to fully perform its obligations hereunder; and

(i) this Agreement has been executed by its duly authorized representative and constitutes its valid, binding obligation.

## 12. PROBIHITION ON USE OF PROCCEEDS AS COLLATERAL

`12.1 The distributor hereby acknowledges that during the duration of this Agreement it cannot use as collateral with any creditors its accounts, accounts receivables or any proceedings from the sale of Produce (including insurance, general intangibles and other accounts proceeds).

`12.2 The Distributor hereby acknowledges that it will not accept any Distributed Asset Pool in the platform that has previously used or that it plans to use as collateral by a creditor of any type.

## 13. SECURED GUARANTY

13.1 <u>Guaranty</u>. Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of all liabilities of the Producer to Company under the Prepayment Agreement dated March 15, 2018 between the Company and Heyvel, now existing and hereafter incurred, including without limitation the Prepayment Sales Commission, Prepayment Recovery Deduction, Late Payment Fee, and payments owed under Section 2.8 for failure to meet Performance Milestones by the Milestones Deadlines (collectively, the "Prepayment Agreement Obligations"). This guaranty is a guaranty of prompt and punctual payment of the Prepayment Agreement Obligations, and is not merely a guaranty of collection. These obligations are independent of Producer's obligations and separate actions may be brought against Distributor.

13.2 <u>Grant of Security Interest</u>. The Distributor hereby grants to the Company a first priority perfected security interest in all of Distributor's right, title and interest, whether now owned or hereafter acquired, in, to and under Collateral (as defined below) to secure payment of the Prepayment Agreement Obligations.

13.3 <u>Definition of Collateral</u>. "Collateral" means all of Distributor's right, title and interest, in, to and under all personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter arising or acquired, wherever located, including, without limitation, all of Distributor's right, title and interest, in, to and under: (a) all goods and equipment, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located; (b) all inventory, including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Distributor's books relating to any of the foregoing; (c) all contract rights and general intangibles, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind; (d) all accounts, contract rights, royalties, license rights and all other forms of obligations owing to Distributor arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Distributor, whether or not earned by performance, and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Distributor and Distributor's books and records relating to any of the foregoing; (e) all documents, cash, deposit accounts, securities, financial assets, securities accounts, securities entitlements, letters of credit, certificates of deposit, instruments and chattel paper and Distributor's books and records relating to the foregoing; and (f) all claims, rights and interests in any of the above and, all substitutions for, additions and accessions to and proceeds thereof.

13.4 <u>Financing Statement</u>. The Distributor authorizes the Company to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Company may determine, or the Company may, at its option, file financing statements or similar records containing any collateral description which

-16-

reasonably describes the Collateral, and the Distributor will pay the cost of filing them in all public offices where filing is deemed by the Company to be necessary or desirable.

*Signature page follows*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**PRODUCE PAY, INC.**

By: _____
Name: Ben Dusastre
Title: CFO

COMPANY: Marabella Produce LLC.

By: _____
Name: Alejandro Knight
Title: Owner.